STATE of Minnesota, Plaintiff,

v.

Lawrence Bruce
MIDDLETON, Defendant.

No. C9–85–1344.

Supreme Court of Minnesota.

May 2, 1986.

Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, for plaintiff.

William M. Schade, New Ulm, for defendant.

WAHL, Justice.

The defendant was convicted by a Brown County District Court jury of criminal sexual conduct in the fourth degree in violation of Minn.Stat. § 609.345 subd. 1(c) (1984). The jury was instructed that the charge required the sexual contact of which defendant was accused be "accomplished or accompanied by coercion," an alteration of the statutory language.[1] The jury returned a conviction and the trial court, with the consent of the defendant, certified four questions as "important and doubtful" to the Court of Appeals pursuant to Minn.R.Crim.P. 28.03 (1985). These questions inquired, in essence, whether the jury instruction given by the trial court properly interpreted section 609.345, subd. 1(c). The Court of Appeals in turn referred the questions to this court and we accepted certification. We answer the questions in the affirmative.

**I.**

Lawrence Middleton is a retired farmer who lived on a farm near Springfield. The complainant, a 21 year old female, lived with her husband, Middleton's nephew, and their young daughter on a farm about 20 miles away from defendant's farm.

Before the incidents that led to charges in this case, the complainant testified that she and Middleton were "pretty good friends." She said she thought of him as a grandfather. The families would often visit back and forth and take outings. Middleton gave several presents to complainant and to her daughter. The complainant testified that during this part of their relationship, Middleton never made sexual advances to her and she did not feel afraid to be alone with him. She recalled, however, that she had been told by Middleton's daughter that she should watch what she said and did around him because he could get violent when angry.

In February 1985, the tone of the relationship changed. Middleton made a trip out of state and, while away, wrote several letters to complainant that contained protestations of romantic love and explicit sexual language. On the day Middleton returned from his trip, March 14, 1985, he came to complainant's farm at about midday. Middleton helped complainant's husband and her parents with some chores at her parent's farm, located across the road. Then, when the work was done, he returned with the complainant and her daughter to their home.

Complainant testified that Middleton kissed her on the cheek when they were in the kitchen of her house and then asked her to kiss him, but she refused. He persisted, she said, then "kind of wrestled me down onto the floor," insisting that he wanted a kiss. She got away, she said, and told Middleton to "quit it," but he just laughed. Complainant said she wasn't hurt or really afraid, but she felt confused because "I have never seen him like that before."

Soon after this first incident, complainant's husband returned home, ate lunch and then returned to his work. Complainant took her daughter upstairs to go to the bathroom and then went into the child's

---

1. Minn.Stat. § 609.345, subd. 1(c) provides:
   A person is guilty of criminal sexual conduct in the fourth degree * * * if he engages in sexual contact with another person and if any of the following circumstances exist * * * [t]he actor uses force or coercion to accomplish the sexual contact.

bedroom. Middleton followed them upstairs. Complainant testified she was standing near the bed when Middleton suddenly pushed her back onto the bed and held her arms over her head. He lay on top of her, "moving around like he would have been having intercourse" and asked her if she could "feel if it was hard." Complainant stated their groin and pelvic areas were touching. She again told him to stop, struggling to get out of the position, and she eventually hit Middleton hard on the shoulder. He got up, laughed again, and said, according to complainant, "You sure are ornery today."

Complainant testified she was afraid after this second encounter. She took her daughter and ran downstairs from the bedroom. She said she didn't leave the house because she didn't know if Middleton would react violently and she was expecting her husband and parents to arrive shortly. She said she had in her mind the warning of defendant's daughter that he might react violently if he became angry.

Once downstairs, complainant went into the living room, knelt on the floor and began playing with her daughter. Middleton came into the room and "kind of half sat and half laid on the floor on his side," also playing with the little girl. "Just like that," complainant testified, "he leaned me back, and he wanted to kiss me again." She said she was "leaned all the way back to the floor" and Middleton was holding her arms with his hands. She said to him, "No, Knock it off. I don't want to kiss you." "I was really mad," complainant testified, "I was hollering." Middleton moved one hand from her arm, touched her left breast through her clothing, and said, she stated, "[y]ou have got nice little titties." The little girl got upset and started crying and saying to Middleton, "[d]on't hurt my mommy * * * [l]eave her alone." At this, defendant let the woman go and said, "I am not hurting your mommy. I just love her, and I want to show her." The complainant said she felt scared during this third incident, "because I have never seen him like this before, and * * * the

way he always treated me before it wasn't the same. It was like he was a completely different person."

The complainant's husband and parents returned home soon after this third encounter. Later that afternoon, when Middleton had left the house to go to town, she told her family what had happened. In the following days, Middleton repeatedly sought to again contact complainant. Finally, on March 21, 1984, she contacted the police. A complaint was subsequently issued, charging Middleton with criminal sexual conduct in the fourth degree.

At trial, Middleton was asked what had happened at the house that day. Regarding events in the daughter's bedroom, he said:

"I don't know. I am kind of an ornery disposition and I more was pestering, or whatever you call it. I grabbed her by the arms and then moved her backward, and when she got to the bed she couldn't go any farther. I sat down beside of her, and we talked about her little girl and about her room."

Later he described what he did as "just work[ing] her back [to the bed]. I didn't push her." When asked if he had kissed complainant while she was on the bed, Middleton said he didn't know, but denied that he had either lain on the bed or on top of the victim. Middleton also denied that he had later wrestled the woman to the floor in the living room. He said that he had merely sat beside the complainant on the living room davenport and hugged her. He denied ever having touched her breasts or having commented on them.

## II.

Lawrence Middleton was charged with having intentionally touched the complainant's intimate parts using coercion to accomplish the sexual contact in violation of Minn.Stat. § 609.345, subd. 1(c). Section 609.345, subd. 1(c) defines criminal sexual contact in the fourth degree as sexual con-

tact[2] by an actor who uses force or coercion to accomplish the sexual contact. "Coercion" is defined as "words or circumstances that cause the complainant reasonably to fear that the actor will inflict bodily harm or, hold in confinement, the complainant or another." Minn.Stat. § 609.341, subd. 14 (1984). "Bodily harm" is defined as "physical pain or injury, illness or any impairment of physical condition." Minn. Stat. § 609.02, subd. 7 (1984).

After the jury returned a verdict of guilty, the trial court stayed further proceedings and certified four questions to the Court of Appeals as important and doubtful:

1) Does 609.345(c) encompass, as criminal sexual conduct in the fourth degree, intentional sexual contact by defendant upon the body of complainant where the complainant at all times resisted the contact and did not submit to the defendant's act? Though the complainant reasonably feared that defendant would inflict bodily harm upon her, within Minn Stats 1984, Section 609.02, subd. 7, if she did not submit, did "coercion * * * accomplish" sexual contact within the meaning of the statute?

2) May the statute be read to punish sexual contact with another accomplished, or accompanied, by coercion (underlined wording added)?

3) If there is no submission, because complainant continued unabated resistance to defendant's act, is the sexual contact accomplished by "coercion" or coerced?

4) Does the statutory definition of "coercion" in Minn Stats 1984. Section 609.341, Subd 14, provide guidance as to how coercion can "accomplish" sexual contact (as distinguished from defining what may be coercive) such that the State need not prove complainant's will or preference was overborne, with resulting submission to the defendant's act?

These questions may be combined, for purposes of analysis, into inquiries about two matters: 1) Does sexual contact *accompanied by* coercion satisfy the definition contained in section 609.345, subd. 1(c) of criminal sexual conduct in the fourth degree?; and 2) Does the statutory language "uses force or coercion to accomplish sexual contact" require that the complainant's will or resistance be overborne by the coercion such that she submits to the sexual contact? The legal issue to which these matters relate is whether, on the facts of this case, there is sufficient evidence of coercion to support a conviction for criminal sexual conduct in the fourth degree.

The complainant testified that she was frightened by the defendant's use of physical force and restraint, and by his persistence in the face of her repeated refusals and resistance. She said she was also afraid that he would become angry, and then violent. But the evidence was that the complainant, despite her fear, objected, fought and continually resisted Middleton's sexual advances. She did not submit.

Given this evidence, Middleton claims the element of coercion was not proved because the complainant's resistance was never overcome, causing her to submit. He contends section 609.345, subd. 1(c) requires more than that sexual contact be perpetrated coercively; the statute's "accomplished by" language indicates the coercion must precede the sexual contact and, by causing such fear that the victim's will or resistance is overcome, make possible the unwanted sexual touching. This interpretation would require proof of a separate act of coercion that preceded the sexual conduct, i.e., it contemplates a sequence of events in the following order—coercion, fear, and then sexual contact. The defendant's interpretation would also require proof that the victim submitted as a necessary aspect of proof that the sexual contact

---

**2.** "Sexual contact" includes the touching of the clothing covering the immediate area of complainant's intimate parts without consent and for the purposes of satisfying the actor's sexual or aggressive impulses. Minn.Stat. § 609.341,

subd. 11 (1984). "Intimate parts" includes "the primary genital area, groin * * * or breast of a human being." Minn.Stat. § 609.341, subd. 5 (1984).

was "accomplished by," that is, made possible by, the actor's alleged coercion.

We have recently rejected a similar interpretation of the "accomplished by the use of force or coercion" language of section 609.345, subd. 1(c). *In Re Welfare of D.L.K.*, 381 N.W.2d 435 (Minn.1986). In that case, we were asked to consider whether sexual contact was "accomplished by the use of force" within the meaning of the statute in the case of a juvenile who overtook his victim by surprise and painfully grabbed and pinched her breast before she had time to resist. There, as in the case before us today, there was no independent or precedent act of force or coercion that overcame the victim's resistance causing her to submit. Rather, the sexual contact itself was perpetrated by the actor in a way that embodied force and coercion.

We concluded, in *D.L.K.*, that the the requirement of force in section 609.345, subd. 1(c) was satisfied "when the actor inflicts bodily harm or pain or the threat thereof on another *while* accomplishing sexual contact." *Id.* at 438. (emphasis added). We merely apply that interpretation when we hold, as we do here today, that when an actor coerces a complainant so as to cause her fear while accomplishing sexual contact, the requirement of coercion in section 609.345, subd. 1(c) is satisfied.[3] Based on this interpretation, it was not improper for the trial court to instruct the jury that the meaning of sexual contact "accomplished by" the use of coercion may be interpreted as including a sexual contact "accompanied by" the use of coercion. The coercion required by the statute need not precede or be separate from the sexual contact. It is enough that the coercive words or conduct, and the fear they produce in the victim, are an aspect of, that is, they happen concurrently with, the sexual contact.

In *D.L.K.* we also specifically rejected an argument that a requirement of proof of victim submission is to be implied from the language of section 609.345, subd. 1(c). *Id.* at 439. We observed that the legislature rejected any such requirement when it enacted Minn.Stat. § 609.347, subd. 2 (1984), which provides "[t]here is no need in the prosecution of [a criminal sexual conduct] case to show the complainant resisted the actor." The argument defendant makes to this court that such a requirement can be implied either from the "accomplished by" language of section 609.-345, subd. 1(c) or from the concept of coercion itself would violate this clear expression of legislative intent. The criminal sexual conduct statutes do not protect only the victim who submits to a sexual assault. The victim who resists is also protected. We reject any idea that the presence of coercion is to be measured by the victim's submission. We answer the certified questions in the affirmative.

Certified questions answered in the affirmative.

---

**3.** This interpretation will not lead, as the defendant suggests, to the possibility that criminal sexual conduct charges may be brought if a participant in a voluntary sexual contact later finds that experience frightening. This hypothetical is absurd because it dispenses with the threshold requirement that a sexual contact between adults is criminal sexual conduct *only* if it is nonconsensual. *See,* Minn.Stat. § 609.341, subd. 11 (1984) (definition of "sexual contact.")